NELSON, Circuit Justice. The libel in this case was filed to recover freight, amounting to the sum of $9.160 56, upon a cargo of coffee and spices shipped from Padang. on the island of Sumatra, and Batavia, on the island of Java, in the fall of 1853. in the brig Gothland. The respondents set up damages sustained by the cargo on the voyage by way of abatement of the freight in consequence of bad stowage. neglect of proper ventilation of cargo, etc. The vessel arrived at this port in March. 1854, after a voyage of ninety-eight days. The court below decreed the whole of the freight for the libelant, with interest on the same, holding that the ship was not chargeable with the damage to the cargo.

Considerable additional evidence has been taken in this court since the appeal on behalf of the respondents. tending to prove negligence on the part of the master and crew in protecting the cargo in the course of the voyage. and also negligence in the stowage or filling the ship. It is agreed by all parties that the damage to the coffee and spices arose from the dampness and sweat of the hold of the vessel, and the material question in the case, and the one principally discussed by the counsel on the argument, is whether or not the damage could have been prevented by proper care. diligence, and skill of the master and hands, or was occasioned by their neglect. In the case of Clark v. Barnwell, 12 How. [53 U. S.] 272, 282, 283, the court held that damage to goods occasioned by the effect of humidity and dampness in the hold, in the absence of any fault in the ship. or in the navigation of her, or in the stowage. was a damage from one of the dangers and accidents of the seas for which the carrier is not liable. The exception in the bill of lading in the case before us is as broad as in the case of the 12th Howard.

The question, then. is one of fact. and must be determined upon the weight of the evidence. We have examined it with a good deal of care, both that which was taken in the court below and in this court. and have arrived at the conclusion that the cargo was well stored and the ship properly filled; that the usual and proper care was taken by the master in the progress of the voyage. at all times, when the weather would permit, to ventilate the cargo by opening the hatches; and that the damage was the effect of dampness and sweat in the hold of the vessel, incident to a passage from a warm to a cold climate, and especially of stormy or tempestuous weather in the latter, without the fault of the master in the navigation. Decree affirmed.

## Case No. 7,062.

### The IRIS.

[1 Lowell, 520.] [1]

District Court, D. Massachusetts. 1870.

H. C. Hutchins and J. A. Gillis. for libellant.

T. K. Lothrop and I. Lincoln. Jr., for claimant.

LOWELL, District Judge. The evidence is not quite as full and minute as in a case of more pecuniary importance it might be expected to be. Taking it as it stands, I find the facts to be that the pilot of the

[1] [Reported by Hon. John Lowell. LL. D., District Judge, and here reprinted by permission.]

steamer ported his helm some time before the collision without knowing that the schooner was near; but that he did this in order to keep the usual course, that is, to follow a bend of the channel which here sweeps to the right, avoiding a shoal. The schooner was outsailing the steamer and her heavy tow and passing between her and the shore on the starboard hand, which brings the case within the seventeenth sailing rule, that every vessel overtaking another shall keep out of her way, a rule which modifies the otherwise universal rule fifteen, requiring steamers to avoid sailing vessels. The reason given by the master of the schooner for not keeping out of the way is that the steamer ported her helm and brought the libellant's barge into contact with his vessel. This is true; but it also seems to be proved that the change was a proper one, and one that the schooner might have anticipated; and that it was made so long before the collision that the schooner had ample time to conform to it. Her master says he could not luff because there was a lighter on his bow, between him and the shore; but on this point he fails of support by any other witness, and I consider the weight of the evidence to be that he might and should have luffed.

Then the question is, was the steamer to blame in changing her course when and to the extent she did? Might not a less change have been enough to clear the shoal, and was she bound to see the schooner? The general rule undoubtedly is, that when one vessel is to take the burden of avoiding another, the latter is to keep her course. But how far a vessel is bound to keep a lookout aft, or to take measures to know whether another is coming up behind her, has not often been a subject of judicial decision. I should say that if a vessel is making a great change of course, such as going about or the like in a narrow channel, especially if the change is taken suddenly or without obvious necessity, prudence would require that others should not be put in jeopardy, but the time and manner of the change should be adapted as far as possible to meet the necessities of other vessels; but here was a change which was necessary, and which was not so sudden or so great that any danger to vessels on the starboard could naturally be expected; and I am not prepared to say that any other or different course would or ought to have been taken if the pilot had known that the schooner was in the act of passing. The preponderance of the evidence is that this precise change was proper and necessary, and that it was one which would not have endangered the schooner unless she had been either too near or not sufficiently vigilant.

So far as lights or lookout on the barge are concerned, it seems that each vessel was in full view from the other, and that there was nothing necessary or useful to be done on board the barge, except to hail the schooner, which the master of the barge swears he did. When barges are towed in the way these were, that is, by being firmly lashed to a steamer, it is not usual to steer the barges, because they move with the steamer. I must therefore hold the schooner to blame for not keeping out of the way of the barge.

It is urged, however, that there can be no recovery in this case, because the allegations of the libel do not correspond with the proofs. It is true that the libel does not aver that the steamer changed her course; but it does aver that the schooner kept hers, and thus brought on the collision. The answer, not denying that the schooner kept her course, sets up the change on the part of the other vessel. I find that both are true; that the steamer did change her course and that the schooner did not, but that the change was justifiable under the circumstances, and that it did not relieve the schooner from the obligation of keeping out of the way. It turns out then that the libel which imputes fault to the schooner in not changing her course is sustained. I doubt whether, even under the strict rule adopted of late by the privy council in England, as shown by the cases of The Ann. Lush. 55, and The North American, Swab. 358, there could be said to be a variance between the allegations and the proofs. But our practice is somewhat less stringent. The object to be attained is that the defendant should know what he is called upon to meet, and in arriving at this object, we allow in the first place great latitude of amendment, and in the next we inquire whether there is in fact surprise in the particular case rather than whether on theory there might be presumed to be such. It has been settled by the highest authority that there is no technical rule of variance in our admiralty practice. Dupont de Nemours v. Vance, 19 How. [60 U. S.] 172; The Clement [Case No. 2.879]. In the former of these cases a libellant, proceeding for the non-delivery of his goods on a contract of affreightment, was permitted to recover a general average contribution for their having been jettisoned; in the other, the owners of a brig who alleged that a schooner caused the collision by changing her course, recovered damages on proof that the schooner kept her course when she should have changed it. Both these cases show a much wider departure than is found in the case at bar. Here there can have been no surprise, because the change of course of the steamer is set up in the answer, and the reason for it is given by one of the claimant's witnesses. It is true that at the trial evidence of the necessity and propriety of the change when offered by the libellant in reply to the claimant's case was objected to, but the objection was not put on the ground of surprise,

but because it was not strictly in reply. The case then comes to this. One party alleges that the other should have changed and did not; and the other that the first should not have changed and did. I find the facts alleged by each to be true. but the explanations of the one to be sufficient and those of the other to be insufficient. There is no rule of pleading which requires me to dismiss the libel under such circumstances.

Decree for the libellant for $1000.

## Case No. 7,063.

### IRISH v. KNAPP.

[5 Ban. & A. 47; [1] 18 O. G. 735.]

Circuit Court, E. D. Pennsylvania. Dec. 20, 1879.

Strawbridge & Taylor, for complainant.

W. W. Weighley and S. E. Cavin, for defendant.

BUTLER, District Judge. This suit is for the infringement of letters patent No. 179,-316, issued to the plaintiff, June 27th, 1876, for certain new and improved methods of making colored photographs on glass, described substantially as follows: Attach the unmounted photograph to a glass by means of paste. After the moisture has dried out, render the paper transparent by grinding down from the back till quite thin with emery-cloth, fine sand-paper, or the like; then place it in a bath of melted paraffine or other similar substance. After a few minutes, remove it and rub off the surplus wax. After the print is thus rendered transparent, paint it on the back with oil-colors or touch up such parts as need it; then lay a second glass against the back of the picture and put oil-colors on its outer side, placing the various tints opposite such parts as may be proper. The colors on the back of the second glass being separated from the picture as described, it is asserted that greater smoothness and softness are thus obtained, and that while the application of paint directly to the paper requires the skill of an artist, the application of color by means of a second glass does not. The

claim is in the following language: "What I claim, and desire to secure by letters patent, is: The process of preparing and producing colored photographs on glass by first mounting the photograph on glass. face downward, then grinding it thin from the back, and then treating it with paraffine or its equivalent, as specified, for the after reception of oil-colors, applied directly to the back of the picture, or to a second glass, to be applied as a backing, substantially as herein described."

While the description or specification seems to contemplate painting or touching up the back of the picture. and also the use of the second glass in all cases, and thus presents a single method of making colored photographs on glass, the claim, as I understand it, has a double aspect, and embraces two processes, the one terminating with the application of paint to the back of the picture and the other with the application of a second glass colored on the outer side.

The defendant does not deny the charge of infringement. The picture obtained from him and produced in evidence was made by the process which embraces the second glass. The defence is rested on the allegation that the plaintiff was not the first inventor or discoverer of this process. To prove the allegation, several witnesses were produced. A careful examination of their testimony has satisfied me that, although the plaintiff was not the first to discover and use the first of the processes embraced in the claim, as before indicated, he was the first to discover the second of these processes, embracing the use of an additional glass. The statements of Mr. Wentworth, Mr. Broadbent, and others leave no room to doubt that the process which is completed by the application of paint directly to the back of the picture did not originate with the plaintiff. The "ivory type," extensively manufactured many years prior to the date of the patent. was made according to this process. the paint being applied sometimes to the face and sometimes to the back of the picture.

As respects the process. however, which embraces the additional glass—the process here particularly involved—the defendant's allegation is not proved. The testimony of Mr. Loudner, invoked to sustain it, is not sufficient for the purpose. The witness is interested, and cannot, therefore, be supposed unwilling to tell all he knows, and yet when cross-examined and required to describe the process he used, being afforded the fairest and fullest opportunity to do so, he omitted the use of the second glass from his statement. When asked whether it was the same as that described in the Photographic Bulletin. and known as "Krauss's." in which the second glass was mentioned. he said it was "to the best of his knowl-

[1] [Reported by Hubert A. Banning, Esq., and Henry Arden, Esq., and here reprinted by permission.]